jiDUFRESNE, Judge.
This is an appeal by Sheila N. Braithwaite, plaintiff-appellant, from an adverse judgment in her suit against the City of Kenner for damages allegedly sustained from overflowing toilets in her house. The basic allegations of her petition were that a failure in the *1095 sewer lines caused sewer water to back up through her bathroom toilets and flood several adjoining carpeted rooms, and that she contracted pneumonia from this damp, unsanitary condition in her house. The trial judge found in favor of the City, stating only that “plaintiff has failed to prove her case by a preponderance of the evidence.” Because we find that there is a permissible view of the evidence which would support this result, we are precluded from reversing the judgment, and therefore affirm it.
The basic facts are these. On the evening of January 5, 1988, plaintiff noticed that the toilets in her downstairs bathrooms were leaking. She called the City of Kenner and a sewerage worker was sent to her house. The worker discovered a blockage in the main line two manholes l2down from plaintiffs house, and cleared the line. Five days later, on January 10, the toilets leaked again, and on this occasion the City workmen found a malfunctioning lift station a few blocks from plaintiffs house. Plaintiff testified that on both occasions there was an inch or two of water in the bathrooms and that the carpets in the hall and several bedrooms were soaked. She further testified that on both occasions the water coming from the toilets was brown, with bits of paper and other solids in it, and that it had a foul odor.
The day after the first incident, William Bagley, the City claims manager, visited the house to inspect the damage. He testified that he saw the wet rugs in the hall and bedrooms, but that there was no strong foul odor or other evidence to indicate that “septic” sewerage, i.e. sewerage that had begun to rot and emit a strong ammonia-type odor, had backed up into the house. He nonetheless contacted a carpet cleaner who came to the house on January 7, and cleaned, deodorized and sanitized all of the affected carpets at the City’s expense. After the incident of January 10, Bagley revisited the house and testified that the carpets were again wet, but as before there was no noticeable strong odor or evidence of septic sewerage. On this occasion, rather than have the carpets cleaned, he decided that replacing them was in order. That work was done at the City’s expense a week to ten days later. Plaintiff testified that on both occasions she spent several hours mopping and vacuuming the water in the house, and as a result of this direct exposure to the overflow from the toilets, as well as living and sleeping in the damp house during the time it took first to clean the rugs and then replace | -¡them, she contracted pneumonia. She spent several days in the hospital and allegedly lost a few weeks of work because of this illness.
Plaintiff brought the present suit against the City to recover her medical expenses, lost wages and general damages. After a bench trial, the trial judge ruled in favor of the City, stating only that plaintiff had failed to prove her case by a preponderance of the evidence. Plaintiff now appeals, and urges two assignments of error on the part of the trier of fact. First, she asserts that it was manifest error not to find that the overflowing of her toilets was the fault of the City in not properly maintaining its sewer system. Second, she similarly urges that it was manifest error not to find that the water in her house caused her to contract pneumonia.
Before turning to the specific facts of the case before us, we note initially that the standard of review of factual findings by an appellate court is extremely narrow. We are permitted to disturb such findings only if they are manifestly erroneous, Rosell v. Esco, 549 So.2d 840 (La.1989). Thus, even though this court may feel that had it been sitting as the trier of fact it would have evaluated the evidence differently and made different factual inferences, it may not substitute its views for those of the factfinder unless those of the factfinder are clearly wrong, Id. Further, where there are two permissible views of the evidence, the factfin-der’s choice between them cannot be manifestly erroneous or clearly wrong, Id. (emphasis added).
In the case before us, plaintiff argues that the trial judge fell into manifest error in not finding that the City was liable for the sewer-agejjoackup, and further that as a consequence of that backup she contracted pneumonia. As to the sewerage problem, there is no question that on the first occasion there was a blockage in the main line, and on the second it was discovered that a lift station *1096 had lost its prime and was therefore not functioning. Beyond those basic facts, there was disagreement as to whether the problems in the main lines could possibly have caused sewerage to back up to the water level necessary for it to flow over the tops of the toilet bowls in plaintiffs house.
Jessie Byrd, an employee of the City sewerage department for twenty-two years, ten of which he spent investigating complaints of clogged lines, testified about the workings of the sewer system. He explained, with the use of a plat, that the main sewer lines operate on a gravity feed system from a high point at the beginning of any one line to a lift station at the lowest point of. the line. The sewerage enters the lift station at its lowest level and is then lifted to a higher level where it exits into another gravity feed line, eventually going to a drainage canal. He further showed on the plat that plaintiffs sewer line and that of the adjoining house both feed into a single pipe which in turn enters a manhole in front of her house. He said that in his experience, if blockage in a sewer line causes a sufficient backup to cause flushing problems in toilets, the same problem would show up in adjoining houses, and not in only one house. There was no evidence of any problem in the adjoining house in this case. He also said that any backup problems caused by clogged lines or lift pump failures typically show up first in the houses nearest to the problem. Again, there were no reported difficulties in the houses nearest the manhole where the first problem was located, nor linear the lift station where the second occurred. He further stated that in all of his years of experience, he had never seen a backup which caused sewerage to overflow over the top*of a toilet bowl. He had, however, seen cases where the wax seal at the base of the toilet bowl leaked, thus allowing backed up sewerage to seep in at floor level. In such circumstances, the seepage would not contain any solids, he said, but would rather be more than 99% water. He also noted in this regard that the condition of the wax seal is the responsibility of the homeowner, and not the City. Finally, he pointed out that if the clean-out cover were open, then any backup of sewerage would drain from this opening in the house line and no backup to the level required even to cause seepage at the floor level of the seal could occur.
There was also testimony by Donald Lee, another City sewerage worker who had responded to the second incident, that the cleanout was indeed open and flowing freely. He agreed with Byrd that in this circumstance no backup from the sewer side of the cleanout could possibly reach the house. Further, with the cleanout open, any water flowing either over the top of the toilet bowls or through the wax seals would have to come from the water supply to the toilets themselves and be the result of some blockage in the homeowner’s line between the toilets and the cleanout. The plaintiffs testimony about where the water was coming from was at best, confused. At one point she stated that it was coming over the top of the toilet bowls, but at another she said that it was seeping out at' the base of the bowls.
leGiven the above testimony, it is evident that there is a permissible view of the evidence which would support the conclusion that plaintiff failed to show that more probably than not the water was entering her house because of some failure of the City to properly maintain the system. While she may initially have met her threshold burden of showing that problems in the lines probably caused a backup, the City rebutted that showing by presenting evidence that the backup was more likely due to failure of the wax seals, or some blockage in the lines on plaintiffs side of the cleanout for which the City is not responsible.
As to the second issue, i.e., whether the leakage was the cause of plaintiff contracting pneumonia, a permissible view of the evidence similarly supports the conclusion that the sewerage exposure was not the source of the diséase, but rather that she contracted it from someone at the bank where she worked. The evidence on this point was presented by four experts, two for the plaintiff, and two for the City. Plaintiffs first expert was her treating physician, Dr. Swan Ward. He testified that he first saw plaintiff on January 20, ten days after the second incident, and determined that she had *1097 pneumonia. Several days later he hospitalized her for a few days and she recovered. During the course of treatment no cultures were done and this doctor therefore did not know whether her illness was due to viral or bacterial infection. He surmised, nonetheless, that it was probably viral. He further gave the opinion that contact with raw sewerage can cause pneumonia and that it was probable that this is how plaintiff contracted the disease. He also admitted, however, that at the time of his treatment of plaintiff, 17pneumonia was going around and he was treating several other patients for it. He also stated that he had never treated anyone who had contracted pneumonia from contact with sewerage.
Plaintiffs other expert, Dr. Jack Ruli, also a physician, did not treat plaintiff, but rather examined all of her medical records. It was his opinion that raw sewerage contains any number of bacteria and viruses that can cause respiratory problems. He stated that this information could be found in any standard medical textbook and that it was standard medical knowledge that raw sewerage is toxic. When asked about the source of plaintiffs pneumonia, he responded that although there was no way to know for certain what caused it, it was his opinion that “there may have been a causal relationship” with the sewerage. Neither Dr. Ruli nor Dr. Ward had ever done any specific studies about the contents of sewerage, nor were they specific about how it could cause pneumonia except that Dr. Ruli mentioned that it contained certain viruses related to respiratory diseases. Both did agree that pneumonia is generally contracted by breathing in the virus or bacteria, and is not contracted through the skin or by other physical contact with viruses or bacteria.
The City first called Dr. Thomas Akers, a virologist and aerobiologist. It was this expert’s opinion that plaintiff could not have contracted pneumonia from sewerage for several reasons. He explained that pneumonia is usually associated with some underlying respiratory infection, such as influenza. He noted, as did Dr. Ward, that at the time of plaintiffs infection there was a flu epidemic in the area and that at least one other person at the bank where plaintiff worked had come down with the flu at the time plaintiff first showed symptoms of a respiratory isproblem. He further said that flu viruses cannot live in sewerage and that their transmittal usually occurs through the sneezing or coughing of infected people in a warm, dry environment, such as a bank in winter. He also stated that he had consulted the literature on diseases associated with sewerage and could not find even one reported case of a respiratory infection being related to such exposure. He finally noted that even were it assumed that plaintiffs condition was weakened by catching the flu at her workplace, she nonetheless would not have gotten pneumonia from the sewerage, but rather would have contracted some gastro-intestinal disease instead, if indeed the sewerage contained sufficient bacterial concentrations to cause any disease at all.
The City’s second witness, Dr. Robert Reimers, was accepted by the court as an expert in municipal sludge management and treatment. His opinion was that there was virtually no chance of plaintiff having contracted pneumonia from sewerage. He agreed with Dr. Akers that respiratory viruses and bacteria are not associated with sewerage, and that flu viruses in particular do not survive in such an environment. He also agreed with the testimony of Jessie Byrd to the effect that it would be unusual for a sewerage backup to cause an overflow from the top of a toilet bowl. He indicated that a very heavy rain might overload the system and cause such a phenomenon, but in that case the overflow would consist mostly of rainwater and would not have a high enough bacterial count to cause any disease. He also agreed with Byrd that if such an event occurred it would cause a similar problem in other houses nearby. However, even assuming that somehow raw sewerage with fecal and other contaminants and a bacterial count sufficient to possibly cause ladisease had indeed gotten into the house, in his opinion the stench would then have been such that no person could have remained in the house for any length of time, much less lived in it for some ten days, as plaintiff testified she did.
*1098 Again, there is a permissible view of this evidence which would lead to the factual conclusion that more probably than not plaintiff contracted her respiratory disease at her place of employment, rather than from the water in her house. This being the case, we are precluded from substituting our appreciation of the evidence, whatever it might be, from that of the factfinder.
For the foregoing reasons, we must reject both assignments of error urged by plaintiff, and affirm the judgment of the district court in favor of the City of Kenner.

AFFIRMED.